We will proceed with our second case of the morning, Huertas v. Bayer. Roberts? Yes. Can you hear me okay? Yes. All right. Ready to go? Okay. Good morning, Your Honors. Max Roberts for Plaintiffs Appellant Huertas et al. I'm joined by my colleagues, Tim Peter of the Fariki Law Firm and Steve Block of Silver Golly Van Tietel. I'd like to request two minutes of rebuttal time. Granted. Your Honors, the District Court issued an opinion on standing that is not only contradictory to the precedent of this circuit and the precedent of other circuits, it also contradicts Bayer's own allegations in a related lawsuit, and it should be reversed. And the first cardinal error that the District Court made was that it found the plaintiff's products were not contaminated with benzene, and therefore, they could not allege that they did not receive the benefit of their bargain. Plaintiffs conducted representative testing on 13 batches of the Lotrimin and Tinactin products at issue. Those batches, as a fact question, are related only to the TN series. Is that correct? I believe so, Your Honor. You're also alleging in your complaint that there was the CV series and the NAAs series, but was there any testing done with respect to those latter two? It appears not, Your Honor. But nonetheless, some of our clients' products were also the TN batches, as alleged in the complaint. For instance, plaintiff Huertas purchased the TN product. I want to understand what you're alleging as to particular named plaintiffs, because you need to plausibly allege that each of the named plaintiffs personally purchased contaminated product, right? Yes. So, we have for five of them, there's no lot number. And when we look at the language of paragraph six of the complaint, it's not clear, and maybe you can clear up for us. Is your assertion that they all did purchase contaminated product because we should take from what's alleged in paragraph six, that they all purchased something with those prefixes of the TN, CV, or NAA? Or is it that all product lines of all of the sprays that are identified as part of the class definition are necessarily contaminated? I think it's more of the latter, Your Honor. So, certainly for the plaintiffs who those lot numbers were either commensurate with our own testing, or they were subject to Bayer's recall and Bayer's own testing that found benzene. As the plaintiffs who do not allege specific lot numbers, what plaintiffs allege is that the recall was so pervasive, and it affected so many lots of this product that it was likely that their products were also contaminated with benzene because they were part of the same. How can we draw any inference from a sampling size of 13 without any context at all? I mean, there's no context as to how many TN, CV, and NAA products there were from September 2018 to September 2021. Certainly, 11 out of 13 is significant in a sampling size of 13, but in a sampling size, I mean, your own complaint says only 35,000 people asked for their money back, but your own complaint says there were hundreds of thousands, if not millions, of consumers. So, if we're talking 13 out of hundreds of thousands or millions without even actually providing us that context or any expert testimony, I mean, how can we draw any inferences from a sampling size of 13? Well, Your Honor, the plaintiff's testing is bolstered by Bayer's own recall, which Bayer does not disclose how many lots it tested, but certainly it didn't test every single lot that was sold over the years. And yet, nonetheless, based on that smaller sample size, it issued this much broader recall. But you're asking us to go beyond the recall. You're asking us to say that the entirety of these product lines, at least in the time period specified in the class definition, that we can extrapolate that those were contaminated. How do we get from the particular prefixes that were recalled and then take the next inferential leap that you're asking for from what was recalled to the entire product line? So, even if Your Honor is worth to say that the most that they could infer is that the specific lots that were recalled, that those were contaminated, so those that start with TN or CV, that would still support the plausibility of plaintiff's allegations because a number of plaintiffs do allege that their products were subject to the recall or have the same lot numbers as Bayer's testing or as our own testing. That's four of the nine, right? So, at the very least, those four of the nine plaintiffs would have plausibly alleged that they had a contaminated product because either, one, their lot number starts with the same digits or the same letters as the ones that we tested, or two, their products are subject to the recall and Bayer found it likely that those products had benzene in it. So, at the very least, those four plaintiffs would have standing, even if the other five did not. So, just to be very clear about this, in paragraph six, where you allege that plaintiffs are purchasers and users of the product, which is described below, were recalled by Bayer, you're stating that as a legal conclusion, not as a factual allegation that all of the plaintiffs purchased products that were subject to the recall. We are saying that all the, we allege that all the plaintiff purchased products that were subject to the recall, although I recognize that in the complaint, some of the plaintiffs did not allege that they had specific lot numbers, perhaps because they used those products years ago and they no longer have that. Let me rephrase it. Is paragraph six saying, because it could be read as saying, the five plaintiffs bought either Lotrimine and Tinactin and later certain Lotrimine and Tinactin products were recalled. That's one way of what that sentence, or it could just be a very wordy way of saying all five plaintiffs purchased recalled products. Is that what, or is it I think the way that that paragraph is worded and reading it very literally as the former Justice Chung, that all those plaintiffs purchased products and that those same product lines were later recalled. We acknowledge that for five of the plaintiffs, there are not lot numbers in here. And so we could, for those, they do allege that they purchased them in the relevant recall period. Would discovery allow them to determine whether or not they were within the lot numbers? For instance, they knew they purchased it at Walgreens on main street on, you know, September 1st, 2020. I believe so your honor, or it could show that Bayer's contamination was pervasive and affected lots of the product that Bayer did not recall. But just, you know, I think that was our basis for saying that these plaintiffs had plausibly alleged standing, but I think it's pretty indisputable as to the four plaintiffs who are testing in terms of the TN that there were nine named plaintiffs at the outset, right? Correct. Only four put forth lot numbers. Is that correct? Four had lot numbers in their possession as far as I understand it, your honor. Let me just take a step back in terms of the facts here. There is a claim that the recall was for all Momotril and Tanactin products. Is that correct? All Ocherman and Tanactin between certain dates with beginning with the lots TN or CV or other values. Correct. But it was very widespread. And is this what a supply chain issue that the supplier to Bayer supplied ingredients that contained benzene and that the benzene products, those that contain benzene were sold to the public? According to the allegations in the AeroPress complaint, which the court took judicial notice of. Yes, that is correct. And is that the sole supplier to Bayer or are there other suppliers of the ingredients for Tanactin? And I'm probably put the emphasis on the wrong syllable, Momotril. Whatever. How do you say? Ocherman, your honor. Ocherman. Okay. Sorry. Your honor, from our understanding, the benzene contamination came from the propellant in the products. And there is at least for as far as we know, one supplier of that propellant in these products, which is the AeroPress. So as to the specific component that was contaminated with benzene, your answer is yes. Obviously there are other components in the product. I don't know who the suppliers are of those other particular components. But it's all traced to AeroPress with respect to the benzene? That is my understanding, your honor, based on Bayer's allegations in the AeroPress matter. Okay. And I think in answering Judge Ambrose's question, you just said the court took judicial notice. I know you're asking us to take judicial notice of the AeroPress, but did the district court actually take judicial notice of the AeroPress complaint? So two things, your honor. First is there was an order on the docket that the court took judicial notice. But if they haven't, I would request that they do. Second, the AeroPress lawsuit was filed after this case was dismissed and already on appeal. So the district court did not take judicial notice because the lawsuit had not been yet filed. Got it. Okay. May I ask you about your benefit of the bargain theory? Yes. It seems that the district court did address the risk of cancer in addressing physical harm, but it was not addressed in the context of the benefit of the bargain theory. But it's my understanding that is what your benefit of the bargain theory is predicated upon, the risk of cancer. Is that correct? I would tweak it a little bit, your honor, but generally. So the benefit of the bargain theory is that plaintiffs purchased products that they believed were properly manufactured, i.e. not with benzene contaminations. And what they got was an improperly manufactured product that had this benzene contamination. And the benzene contamination was so significant because it was above this FDA threshold of two parts per million that it put them at risk of developing cancer. And obviously that was not something that they bargained for. And in line with precedent from within this circuit and outside this circuit, that is sufficient to instill economic damages because obviously a defective product, one that's properly manufactured, does not carry this risk, cannot be worth the same as a version of the product that is improperly manufactured, has this contaminant it's not supposed to have, and has this risk. But your theory is an economic theory at the end of the day, right? Correct, your honor. As distinguished from J&J. Well, your honor, the In re J&J case, I guess there are multiple elements of this, but one in front of the third circuit was an economic loss class action, although there were personal injury lawsuits. The issue in In re J&J and the reason it's distinguishable is one, the plaintiff there did not allege an increased risk of developing ovarian cancer unlike here. And two, she in fact expressed a willingness to, you're about to ask a question. She did express a concern about the risk, but she didn't make allegations as to financial harm. She expressed concerns about the increased risk, but she did not allege that she in particular had an increased risk. And she did say what I bought was not worth as much as what I bargained for, but this court did not find that plausible because she also expressed a willingness to keep buying the product at the exact same price as she always had. So it wasn't plausible to say that she didn't get the benefit of her bargain because she was willing to keep paying the same price for it now, knowing of the risk. Is there a difference between J&J in that she bargained for talc and received talc, whereas here they bargained for the active ingredient intonactin and loturmin and it had the addition of benzene? I think that's another difference between this case and the J&J case, Your Honor. Certainly, that as far as the allegations in J&J go, she got exactly what she received. It had this undisclosed risk, but there wasn't anything defective about the manufacturing of the product. Here, the product that plaintiffs received, and I see my time is up. I briefly finished answering your question. One more time. Okay. The product that plaintiffs received here was not the same one that they bargained for because it had this additional contaminant that wasn't supposed to be part of the product. Is that really a distinction? Isn't it a problem with talc that it has asbestos and that that creates the carcinogenic risk? Is this really just semantics? I think it's a little bit different, Your Honor, because it's an inherent component of the product that might have this risk as opposed to something that's not supposed to be in the product. But even if Your Honor wanted to say that that was not a distinguishing factor, the other elements of In re J&J versus this case, that the plaintiff did not allege an increased risk as to her, that she was still willing to keep buying the product at the exact same price, even knowing this risk. Is that the key distinction? That she's going to continue buying the product. She's not really upset with the product. That is a key distinction, Your Honor. And in fact, that's the way that the even flow case from the first circuit distinguished in Ray Johnson and Johnson, that though this court acknowledges that there is a benefit of the bargain theory for economic harm, the plaintiff there didn't plead it because she was more than happy to keep buying a product that put her at risk of getting ovarian cancer and wouldn't pay less for it. So how is it plausible that she didn't get what she paid for? Versus here, all plaintiffs are saying, we're not going to keep buying the product. In fact, we stopped using the product as soon as we learned of the benzene contamination and Bayer itself has said, we had to destroy this product because it's unsaleable once we learned of the benzene contamination. So there are allegations here, unlike an in Ray J and J, that they would not have paid as much for the product, or they wouldn't have been able to buy it in the first place. Had they known of the benzene contamination. Can you clarify in terms of your theory of liability, you can have a deficiency in the manufacturing process, but contamination is separate statutory basis, right? For a product being adulterated. And you, you don't seem to be at least citing to the statutory basis and arguing so much about contamination. Should we understand correctly that your theory of liability here is as to the manufacturing, the defect in the manufacturing process? Yes, your honor, that the defect in the process or the failure to follow current good manufacturing processes resulted in this benzene contamination of the product. So they kind of go hand in hand. This is a, I realized a bit of a digression, but let's assume that we agree with you that they're standing. What would you suggest to the court is the proper class determination here? Well, obviously with, with the caveat that class definitions can change prior to, and even after certification, it might be anyone who purchased these products. Lines bearing the same lot numbers as were found in either the recall or the TN CV that were found in the recall or in our testing, because that would align our allegations and our class definition most closely with what our testing found and what the bears testing found to be contaminated with benzene. That's not the way you've proposed to define the classes currently. That is correct, your honor. However, as I just said, class definitions can change up to and leading to class certification. And often class definitions will start with a broader class only to be narrowed after discovery and perhaps holdings by the third circuit that force you to narrow it anyway. So that, that could be a way that would most closely and best give everyone in the class standing because we would not be alleging any sort of contamination beyond those lots that were recalled or that our own testing found had benzene in them. Obviously though, if discovery were to show, you know, what bears recall was not as expansive, it should have been, there were other lots that should have been recalled, but weren't, then that could also be included in the class definition as well. And that's why I'm hesitant to sort of say, this is what I'm going to move to certify and however long it takes without that benefit of that discovery. Okay. You, you've argued in reply that the injuries are not contingent on, uh, on the statute, uh, on, on, on the regulations, recognizing that, uh, they don't on their face, uh, seem to be mandatory, uh, but, uh, more by way of guidance, but how, how can there be a basis for arguing the economic diminution without reference to this statutory regulations? Your Honor, because there, we do not need the FDA, uh, the Food, Drug and Cosmetic Act to say that the products have something in them that they shouldn't have that renders them less valuable. Specifically, we cite literature and the complaint that talks about the harmful effects of benzene. So even absent any sort of FDA guidelines, even absent the Food, Drug and Cosmetic Act, there would still be a claim here because the products are still contaminated with some sort of dangerous component that they should not have. And therefore. So do I take that to mean the FDA guidance, as I understand it is actually guidance for products for which the exposure to benzene is unavoidable so that people who buy those products, part of benefit of their bargain is that the product was manufactured with some risk of benzene up to two parts per million. Whereas you're saying this product does not cover, even though it's just guidance, it's not even covered by the guidance because the manufacturing process is not supposed to include a risk of benzene. I think that that's fair, Your Honor. But I would also say that even if that guidance applied to these products, so that there was a two parts per million limit, our testing and Bayer's testing found benzene contamination in excess of that. And there's nothing in your complaint that references Bayer's testing, only the recall, and your testing is without any context. Your Honor, because Bayer's testing did not come out until the AeroPress lawsuit that was filed after our complaint. So we now have the benefit of Bayer's own testing, which Bayer claimed. We tested it. We found above two parts per million in lots going back to 2018. And that's why we issued the recall. That was filed last year. So that was obviously after this case was already on appeal and we didn't have the benefit at the time of our pleading. Had we had it, we obviously would have alleged things about that. And if hypothetically you're left with some plaintiffs, some named representatives, and not others who are currently in the suit, does that also mean that in terms of class definition, as you were suggesting before, that there would also need to be an alteration in the product lines? No. No, Your Honor. So there would need to be an alteration in perhaps some of the state subclasses to the extent that a class representative from one state where there are no others is dismissed. But something that we would argue is that these products were substantially similar. And courts have sustained class definitions where, for instance, you purchase one product and there's no significant differences between that and another product in that same line. And both of them suffer from the same defect. So if Plaintiff Fuertes purchased Lotrimon product A and that and Lotrimon product B, which he did not purchase, were subject to the recall, they had the same defect. And the only difference is that they're labeled differently because one is Lotrimon after dark and the other one is Lotrimon in the morning. He's going to have the standing to represent both of those purchasers of both of those products at class certification because they're substantially similar. There isn't such a thing as Lotrimon after dark. I understand that, Your Honor. When I played sports, it was just fast actin-tanactin. I understand that, Your Honor. So he purchased Lotrimon antifungal athletes, but deodorant powder spray. There are other Lotrimon product lines that are substantially similar. And the only difference is really that they have a different brand name, but they otherwise have the same component and the same defect. So we're left. Sorry, I feel better now. Building on Judge Ambrose's earlier comment question, if there were standing as to four plaintiffs, it seems that the district court only made rulings regarding the 12B1 claims. Would the court then have to consider 12B6 asserted whether the claims were stated or? Yes, Your Honor. The court never reached the issue of the 12B6 motion because it dismissed on 12B1. To be clear, we do also have alternative theories of injury even outside of the benefit of the bargain. But I understand that. But it's also reliant on whether or not this court finds sufficient or allegations that all plaintiffs' products were contaminated. And if we were to agree with you on the benefit of the bargain theory, then your other two theories we don't need to reach. That's correct, Your Honor. Assuming we don't agree with you on that first theory, why don't you talk to us a little bit about the second and third? Sure, Your Honor. So just quickly, I'll address the replacement product theory because it only pertains to Plaintiff Huertas. Plaintiff Huertas alleges that as a result of the benzene contamination, he could no longer use his Lotrimine product and use boric acid. The contention there is whether or not boric acid is an effective treatment for athlete's foot. And there's some literature saying it is. There's some literature saying it's for a completely different purpose. That's a question of fact as it stands. He's alleged enough to say, my product was contaminated. I was no longer able to use it. I purchased something that I thought would be a suitable treatment. That's plausible to say that he sustained economic damages because he would not have bought that product but for the benzene. Is it a plausible inference that it was in response to the recall when he earlier makes a factual statement that he did not receive notice of the recall? It's plausible that it was in response to the benzene contamination itself, Your Honor. So there's no, the plaintiffs allege they did not learn of the from other sources. But is there anything in the complaint that plausibly alleges that? It seems that they just say, you know, in response, but there's not a fact pled. There's only a fact saying they didn't receive notice of the recall. Is there anything that you can draw that inference from other than, you know, that sort of introductory clause to wasting and replacing? Just to clarify your question, Your Honor, is there anything in the not learn of the recall? My understanding is it does say that. Right. But it also, but that the complaint doesn't have a different factual allegation, but they did learn of it, you know, via the TB or like a friend or even something broader that just says at some point they learned. It seems there's just an introductory clause saying to the replacing and wasting. Is that enough to draw an inference that he actually did it in response to the presence of benzene? Well, at least at the pleading stage, Your Honor, and I think construing all inferences in our favor, yes, because as you just said, there are other instances or places in which plaintiffs could have learned about this contamination that isn't from the recall. Maybe they saw something on the news that said Bayer's products are contaminated that didn't announce the recall. Maybe their friend told them that's an issue for discovery. There's no allegation that he even learned about the benzene contamination from some source. There's simply what could be characterized as a conclusory assertion that he made a different purchase as a result of the recall. There is no allegation as to where plaintiffs learned of the benzene contamination from, that is correct. Where is the allegation that they learned of the contamination? That is correct, Your Honor. That is what the complaint says. I don't see it. Where does it say that? That they learned of the benzene contamination? I would say it's in the end. So, for instance, for plaintiff where it is, I'd say it's in paragraph 81, which is page 264, which is that as a result of the contamination. And I think construing the plaintiffs or the allegations in our favor, that's sufficient to say that the plaintiff learned of the benzene contamination because he could not do something as a result of the contamination unless he knew of the contamination itself. That's the best you can point us to in the complaint for something that's not simply a conclusory assertion as to the fact of him getting knowledge at some point before purchasing the replacement of the recall. Yes, Your Honor. But again, construing the pleadings liberally, I think that that's sufficient. And I think it's certainly plausible that they did not learn of it from the recall because the recall, I mean, we list a number of inefficiencies with the recall, but one of it is that it was inadequately publicized and for that a product that was sold to hundreds of thousands of consumers, Bayer received a measly 35,000 claims. How about your theory of waste? So the theory of waste, Your Honor, is that as a result of the benzene contamination, we're back there again, plaintiffs were forced to stop using the product and whatever portion was remaining, they could not use. And the district court held that that wasn't sufficient under the facts of Cattrell. And while Cattrell certainly sets forth something that is sufficient for standing, it does not set forth a floor for standing. So plaintiffs saying that they learned of this benzene contamination, they stopped using the product as a result of the benzene contamination. They don't have to physically pour out their loturmin and tranactin bottles, measure it and say, oh, that's how much I wasted at the pleadings. What they've alleged is more than sufficient. And it's corroborated by the fact that once the product that were contaminated as unsaleable. So there is corroboration to our allegations that once plaintiffs learned of this contamination, they could no longer use the product. So if your primary argument is that we didn't get, we got less than what we bargained for. If you have waste and replacement, aren't they really subsets of that? You're just getting less of what you bargained for because some you would have to throw away and some you would have to, if you want to continue to use the product because it was effective for your athlete's foot, athlete's foot condition, then you also are not getting the benefit of the bargain. You could say that, your honor, the difference would be in the amount of economic damages that plaintiffs could recover on. You're getting less and less and less of the bargain. Well, I'd say in all three instances, your honor, you're not getting the benefit of your bargain. The difference is, am I suing for a full refund of the product because the whole thing is worthless? Am I suing just for the portion that is remaining in the product because that's what I was unable to use? Or am I suing for the price that I paid as a result of buying a new product? Which one are you hanging your hat on? I'd say the former is the primary argument here, your honor, that these products were worthless because they were manufactured effectively and contaminated and plaintiffs did not receive the benefit of their bargain. The overpayment theory, as it were. The district court was conceptualizing this as you buy a product for a particular purpose. It served that purpose. And at that point, you don't have any further need for what remains. And so the questions that the district court put out there about whether there was a further treatment needed, expiration, etc., then become relevant. What's wrong with that approach? Well, your honor, when you, so let's say I buy a bottle of Tylenol to cure my headache and the Tylenol cures my headache. Does that mean that I have to throw out the bottle of Tylenol because my headache's gone? No, of course not. I'm allowed to retain that bottle as a, in case the headache comes back, which in this line of work we're all stressed, it often does. The same applies to Lotrimin and Tinactin. The product might cure my athlete's foot, but if I still have product left in there, I'm allowed to retain it unless the athlete's foot, you know, if the athlete's foot comes back. I mean, for instance, I'm a subject to said fungal infections, but I might want to keep around whatever Lotrimin and Tinactin I have because it's likely to reoccur. And plaintiffs are allowed to retain that product. So the problem with the district court's decision is that it's saying that once you use it, if it cures it, you're not allowed to retain any portion of it. That just doesn't make sense. That's not how consumer products work in general. You have an absolute right to keep whatever portion of a product you haven't used for future use. Okay. All right. Thank you, your honors. Thank you. Zions? Zions, your honor. Thank you. Good morning, your honor. May it please the court. David Zions on behalf of Apelli Bayer. If I could, you know, since your honor started with the representative sampling issue, if I could briefly start there and then I'm happy to address the three different theories. I'll start with the threshold issue. Yes, your honor. You say on page 15 of your brief that the plaintiffs offered no factual allegations that any of the products they purchased were contaminated with benzene. Well, consumers don't need to go out and test the individual products, do they? Your honor, you know, we think you need to do something. I don't think they need to go take the particular, necessarily the particular canister they got, take it to the lab. And that's the only way that you could do. Certainly that's something that one could do to establish standing. We talked, you know, we're not against the principle of representative sampling, but it has to be representative. But there's a recall. Is it a realistic thing to ask of a person whose medication has been recalled that they have to go out and do some testing? Your honor, you know, I think the recall, which, you know, the plaintiffs incorporated into their complaint, it says on its face, it's a precautionary measure. It is not, you know, Bayer did not say every product in this recalled lot we've concluded has benzene. There was a process, a path available to any consumer here, not an article three process, but a Bayer recall process where anyone was going to get a refund. You don't have to do any testing. That was the sort of broad precautionary protective of consumers thing that Bayer did. If, you know, plaintiffs decided not to pursue that avenue to go the article three court revenue avenue, that's fine. But that comes with being able to plausibly allege that they were harmed, that they, and part of that is that they received something that was contaminated. So in principle, so I think to look at these nine plaintiffs, five of them don't even plead that they had products that were in the lots that were even subject to the recall. For the other four, I thought I heard some suggestions before that the plaintiffs conducted testing on the specific lots, which I think would be something that might be a reasonable way of establishing that. That's not what the complaint alleges. The complaint alleges that there was testing in the TN series, that that's what the plaintiffs did. Is the TN, CV, and NAA series the only ones that are back to the making of Lotrimon and Tinactin? Your Honor, that's outside the record. My understanding is that's not the whole universe. I think if that was it, you know, the recall would have just said, you know, if you, any Lotrimon or Tinactin between 2018 and 2021, you know, that's not what the recall said. It said in lot numbers beginning with these letters. So I think, particularly absent any allegation to the contrary, the sort of only inference there is that that's not the full universe of Lotrimon and Tinactin products. So you're a consumer and you learn about this recall. What would you do as a consumer then? What are you supposed to do? Well, Your Honor, I promise to not make this point beyond this. You know, one thing that the consumer can do is to go to Bayer and say, I'd like a full refund and they would have gotten it. The other thing, if you want to sue in an article three court, you know, they know that Bayer took a precautionary measure. I think, you know, plaintiffs started to do what one might do, which is conduct some testing, but they did not, they don't include allegations that make it representative sampling to Judge Chung's questions earlier. You know, it's not impossible to conduct some testing in a rigorous way to include some allegations explaining how what you've done is representative and how you can infer, you know, I did, you know, this amount of testing and that gives me a basis to infer that these products that I bought. At the complaint stage, why does it have to be recall plus testing? I can see what you're relying on 13 tests, but this is recall plus testing is what you're saying has to be, has to be pled sufficiently to allege injury. Why can't at the pleading stage, why can't they just rely on the recall? Well, Your Honor, when they rely on the recall, I think you have to take the whole recall, which says that it is a precautionary measure. It is not a suggestion that everything, you know, it's almost, you know, I think. At the pleading stage where, you know, they're the consumer, you're the ones with the, the information, what else can they do other than rely on the recall? I think plaintiffs, you know, didn't consider that sufficient because they, they, they, they, you know, rely on this testing as well. And one thing that that testing showed, they only tested, this wasn't, you know, a sample of, of all Lotrimin and Tenactin. They only tested recalled products and not all of them tested positive for benzene. Certainly a lot of them did, but not all of them did. So I think that, you know, that is what adds to the, to this, to a layer of layers of speculation here. So, so what we know just from what plaintiffs allege is that not every product that was recalled had benzene in it. Is it your position that it has to be a hundred percent of the testing returning that it has benzene in order to extrapolate from that to the, the product lines that are recalled? Yeah, I don't, I don't think it necessarily has to be a hundred percent. If you had, you know, if you had some allegations about what made this representative and got the overwhelming majority, you know, here, what we have is no indication at all of how this is representative, how the lots that were tested, you know, make it more or less likely that the lots that the plaintiffs used had benzene in it. But what we do know is that, you know, this, this sample that they used didn't all test positive. So I think if you had a different type set of allegations, really making it representative and really making it overwhelmingly likely that anything that was recalled had benzene in it, I think that would be different. They tested six product lines, right? I'm not remembering that off the top of my head, Your Honor, but I don't necessarily disagree. Let's, let's assume that there were six that were tested of the recalled products and let's, let's say a hundred percent of them did test positive. Would you then say that it, it was reasonable to project from there that all of the recalled products had benzene? Your Honor, I think it would depend on the allegations. I, you know, if you had some allegations about a statistical reason why the, why, why you could make an inference from those six that it's representative, then perhaps, but I just, I think, you know, what, one thing that's constant in the court's cases, you know, is, is some demand for some, some rigor, not a lot, but, but something in that, in the Finkelman versus NFL case, you know, the court sent the stage because they had a speculative theory about, about how pricing worked for NFL Super Bowl tickets. And they thought, you know, you know, maybe it's this inflated the price. Maybe it didn't. They went back. They added you talked to an economist, added some allegations for a plausible theory. And that was fine. So I hear that if that representative testing was enough for Bayer to conclude that it was advisable to recall all of the products lines that they did recall, why, why shouldn't plaintiffs be able to rely on that inference as well in their complaint? Sure. I think on the face of the recall, it was intended to be overly protective and precautionary. I think it's also, you know, I don't think we want companies to be discouraged from, from doing that, you know, from, from taking an overly protective and cautionary approach. So that, that would be my answer if, but, but your honor, you know, I think even if that were enough for, for some of the plaintiffs here I think that's just sort of a gating issue. And then you get into you know, the other reasons why, even if, even if they did plausibly alleged that their products had been seen, they still haven't alleged a benefit of the bargain. I'm happy to turn to that, but also happy to continue if there are other questions about the, about the sampling and the presence of benzene. I'd like to turn to that. And let me start you off with the question of why we should not in this case be considering judicial estoppel in light of the assertions that Bayer made in support of its own case for standing in AeroPress. Because, you know, while saying here that the plaintiffs haven't plausibly alleged that the products were worth less than they had bargained for, there are statements in the AeroPress complaint and Bayer's pleadings there that this is damaged, unsalable product, that it's not of merchandisable quality, that it's not fit for human consumption, you know, and application. And that it's unreasonably dangerous. Sure, your honor. So I think I take, I would understand those particular lines of that context, which is a contractual dispute with AeroPress. And in particular, you know, there's discussion in that complaint of how, you know, what was contemplated, the provision that Bayer was suing under there, you know, specifically contemplated that it would, that it would deal with recalls. So it's certainly the case that, that you had the FDA recommending a voluntary recall in these circumstances and Bayer, Bayer was doing that. So outside of this world of, you know, of, of article three injury, you know, Bayer is taking a precautionary approach. So part of the benefit of the bargain between Bayer and AeroPress was that it would not be contaminated. Your honor. Yeah, there was a, there was a contract between Bayer and AeroPress and the allegation and Bayer's complaint against AeroPress. But it's not reasonable for a consumer to feel that that's part of the benefit of the bargain of purchasing that product? Your honor, I think it goes back to the court's J and J decision again. This is very different facts than J and J. I mean, the person there didn't really allege an injury. In fact, she's going to go out and, and buy further J and J products that were involved in the suit. So putting J and J aside for the moment, and I realize you're saying that somehow it's important here. Assume for the moment it's not. What would be your response to Judge Chung's question? If the benefit of the bargain applies between the supplier to Bayer, why would it not apply from Bayer to the consumer? Sure, your honor. If I could just, I do want to, I'll answer this question. I hope to be able to come back later to the question about, about J and J and whether or not, but certainly we'll answer your question first. You know, I think it's just a different analysis. There was a contract between Bayer and AeroPress. There was an allegation. It's explained in the complaint that it specifically contemplates the possibility of voluntary recalls. And that's, that's what is happening there. And, and, and this is not a situation where Bayer is saying, you know, we're going to go after AeroPress, but we're going to a refund. It's just a different set of issues when you come to article three court and you have to allege that you personally are injured. The plaintiffs allege an economic, an economic injury. So I just think it's, it's a little bit apples and oranges with that, with that lawsuit. But how can, how can you be alleging on the one hand that the product is damaged beyond use or and, and then say that that's the expectation of the consumer? You know, it's not implicated for the same reasons. Your Honor, I, I don't, I don't doubt, you know, plaintiffs have alleged here. I wouldn't have bought it if I had known this, that is exactly what, what the allegation in J and J was. I know, I know Judge Ambrose, you have the question about whether, whether J and J is analogous. You know, that is the exact allegation in J and J. I would not have bought this if I had known. Well, I mean, you want to go back to J and J for a second. I mean, the plaintiff's injury there, of course, that it lacked particularity because she argued that the injury was to others, not herself. Consumers here are not saying that. And J and J, she didn't argue that it was worth less financially. Your Honor, I, I paid for it. I took that to be the I think that the theory in J and J was, you know, I wouldn't have bought this product. It wasn't worth anything to me for that reason. I do want to just go. A particular person said she would go back and buy the product again. Yes, Your Honor. So I think you're going, this is page 288 to 289 of the J and J decision. What, what, what the court says is, well, can't we just assume that she would have paid less for an unsafe product? The court says no, for two reasons. The first reason the court gives is that, is that, is, is the point you just made exactly Judge Ambrose, which is, you know, she wanted to keep buying it so you can infer that, that, that she would pay less for, for, for unsafe powder. But that was one of two reasons. Then there was a second reason that the court went on to give, which is that the product was safe as to her. She didn't complain that it caused her any harm. And we're in the same situation here. The court went on to say she might have had standing if she alleged risk of cancer. If you go, it's almost a 290, but she didn't allege that. And here the district court didn't even consider that part of the plaintiff's benefit of the bargain theory. Your Honor, the court separately addressed that, you know, the way I, physical injury, but not as specifically as to physical injury, but not in the context of their benefit of the bargain theory. Sure. And unlike in Johnson and Johnson, the plaintiffs here did assert that their product was worthless, not only because, you know, they don't say they actually sustained physical injury, which was part of the second reason you pointed to, but the court also said if they had in J&J asserted a risk, which she didn't, that could have been sufficient. And here they did in fact assert that risk and the district court didn't address that at all. Sure, Your Honor. So I read J&J, you know, that part of opinion to be talking, not about the benefit of the bargain theory, but about physical injury. Had Estrada alleged that she was at risk of developing ovarian cancer, she may have established standing based on a theory of future physical injury. And that's the same theory of future physical injury that the district court rejected in the physical injury section of its opinion and that the plaintiffs didn't appeal. Well, specifically talk about the risk of which is part of the benefit of the bargain theory. Sure, Your Honor. So I think another, you know, another issue here, and I think that's where, you know, plaintiffs may say in the complaint there is a risk. They need to plausibly allege the risk. What they actually allege in the complaint is a CDC document that says when you use something with benzene in it for a year or more, it has a risk of carcinogenic effect. This is a product that by its nature is used for two to four weeks, and if not, you see a doctor. It was for a limited period of time that this issue was there. It's actually quite different from talc in a couple of senses. One, you don't have people using this possible carcinogen for 50 years. This was an issue isolated to a moment in time, and you had people only using it for a very short period of time where the plaintiffs are incorporating, you know, guidance from the CDC that that's not enough for it to have carcinogenic properties. So I think that may be a reason why the plaintiffs really haven't put much emphasis on that in terms of this future physical injury theory. Thank you. I see my time is up, but I'm happy to address additional questions, on the other theories, if the court has them. One thing on the waste, you made an argument that people don't use it until the athlete's foot condition is gone, and then they just throw it away. That wasn't my experience. Maybe I kept connecting for years, but I never threw anything away. What makes you think people do throw things away that they just have no need for at that point? I think the fundamental issue here is the lack of allegations in the complaint one way or the other. You know what the court has said in its various decisions, we can't just assume things for purposes of standing. You're making an assumption that they throw things away that they have no current use for. Your Honor, I'm positing what the court did in Finkelman at the Human Nature. Do people throw things away that they currently have no use for in terms of medications? I think some people do. I think some people are rigorous about the expiration date. Some people may be less so. If these are individuals who had a future need, expected a future need, or even wanted to have this around in case they had a future need, that was something that they could have alleged. Instead, you have this. But in Finkelman, that was something you need expert testimony. I mean, this is just common experience of humans. I mean, Finkelman seems to be of a totally different nature as far as what a reasonable inference is and what is needed to make a reasonable inference. Sure. I don't mean to make an analogy that's stronger than it is. My point is just these are wholly conclusory assertions that happen after the district court. This started with just the benefit of the bargain theory. The district court says, that's not good enough. It gave them ideas. Do you have anything about waste? You have this kind of cookie cutter that applies regardless of whether anyone bought a product with the lot number that was in the recall. You have plaintiffs saying, I think I bought it in a three-year range, but then they just sort of add this conclusory assertion, I didn't use it all, therefore I or anything that detailed. But if it's really the case that these individual plaintiffs are injured because they wanted to keep this around, they thought they might need it, they made them feel better to have it just in case they got athlete's foot again, that's all fine. The plaintiffs were told by the district court what you had wasn't sufficient, gave them this concept of waste and all they did with it was to say, yeah, we wasted it. And that's the sort of I keep a storage or I have a hoard of this because of my recurrent problem and my entire family is actually a softball team. Would that have been sufficient for a wasting theory? I keep it on hand. Your Honor, I think that would have gotten them a lot closer. I do want to point to, I realize we're really getting into the weeds of J&J, but footnote 15, I think is important in J&J where it's where the court discusses, it sort of endorses the unpublished opinion in Caranthalee versus L'Oreal. And it quotes the allegations there, which includes basically the same thing as here. The plaintiff did not know when she purchased the products that they contained any lead. And when she learned of the lead content, she immediately stopped using them. So that is almost exactly the same as the allegation here of waste. But then the court in J&J goes on to say, these facts are nearly identical to the operative facts in this appeal. I think this is also an interesting example, just in terms of why J&J is not so limited to the peculiarities of talc. This was a circumstance where it was much, the facts of Caranthalee are quite similar to those here where you had a lipstick that it wasn't like talc. I wanted talc. I got talc. I just didn't know that it had the side effect. It was I wanted lipstick. I got lipstick. No one told me it would have lead in it. I think that's actually pretty close to what the plaintiffs are alleging here. And it's what the court in J&J thought was essentially identical to the facts there. You would make the argument that appellants have not identified a legal prohibition on selling the products. But as they've clarified, and it's certainly a fair reading of the complaint, that their theory is drug adulteration via the manufacturing defect, the failure in the manufacturing process, and looking to the good manufacturing practices. Why isn't there a legal prohibition in the sense that there are certain requirements for testing? There are certain requirements for disclosure. If that's their theory, then why isn't that enough on its face to say we're not talking about a risk of harm. We're talking about a manufacturing process that is required under the law. I think in principle that kind of theory could work. That's what was accepted by the 11th Circuit in the DeBernardis case. I think it's open question. There's the Thorne case in this circuit that may cast some doubt on whether that would fly here. But I think that would be a very different case. I think the most important point for purposes of that theory is that a legal conclusion is not something that is just taken for granted on a motion to dismiss. Saying it's adulterated is not enough. That's a legal conclusion for a court to make. I just haven't seen from the plaintiffs any explanation of how they get to an actual legal violation. There are FDA regulations about current good manufacturing practices. I don't see allegations in the complaint. Actually, they say, well, this had benzene, so there must have been a problem with the manufacturing process. That's not enough. They need allegations and they need to show. I don't see in the brief either. Their position in the brief, as I took it, has been it doesn't matter because we don't have to show a legal violation. So I don't think the court, if they're pivoting to a theory of, well, actually there was a legal violation, I think we would need an opportunity to actually engage on that because that's fundamentally a question of law, not one that you can just say it's adulterated as a matter of law, credit that, therefore it's worthless. Thank you, Your Honor. Thank you. Mr. Roberts, can we pick up there? Are you pivoting and changing the theory of liability? Not at all, Your Honor. I think the theory of liability is, as I argued on my argument before, is that this product was not properly manufactured. That resulted in the benzene contamination. That was part of the benefit of the bargain and that's what plaintiffs didn't get. And that's corroborated by Bayer's own statements that in their own complaint, they say Aeropress did not manufacture its component in accordance with its standards of product manufacture. So Aeropress, you didn't do what you were supposed to do. You failed to properly manufacture it. Now there's benzene, but oh, consumers, we did everything that we were supposed to. And I think that's a lot of what I heard from Mr. Zion's argument is that there's sort of a double standard. But what's good for the goose is good for the gander. If Bayer's testing is representative of a larger sample and it shows that there's a likelihood of benzene in all these products, that has to also be good for us. If it was part of Bayer's benefit of the bargain with Aeropress that their products aren't going to be manufactured with benzene, how is it not also sufficient for consumers? How is there a breach of a contract if you don't have a product that's problematic and unsaleable? Well, I took him to be arguing that we're looking at in the facts of the complaint and the specificity of the pleading, that what's in the complaint seems to go more to a theory of contamination. And if it's going to a theory of manufacturing process, that there would need to be particular allegations as to how Bayer itself failed in those processes that are mandated by law. Well, Your Honor, I would say that we cite a number of CGMP guidelines in the complaint that plaintiffs allege Bayer failed to comply with. So for instance, if you look at pages A-251 to A-254 of the record, we talk about these are the things that Bayer is supposed to do and Bayer didn't do them. And obviously, discovery will illuminate those facts and I see my time is up. What was necessary? What was Bayer supposed to do? Bayer was supposed to do more thorough testing, for instance, on its products to ensure that was not these benzene contaminations. There was, for instance, we cite CFR 211-160, laboratory controls shall include the establishment of scientifically sound and appropriate specification standards, sampling plans, and test procedures. Obviously, something incorrect happened in the manufacturing process because AEROPRESS says we did not adhere to our standards of manufacturing, therefore there's benzene. And that benzene contamination, despite extending all the way back to 2018, wasn't caught until 2021. So there was a failure to properly make this component. There was a failure to properly test this component. And that resulted in the sale and the creation of products that were contaminated with benzene. And that's what plaintiffs allege here. And those are allegations that have been sustained, by instance, for district courts in the Northern District of Illinois, where it's not just, the product was contaminated, but also that you sold a product that wasn't properly manufactured, resulting in this contamination. And that was unfair under that state's consumer protection statute. So I just want to be clear. So in paragraph 54, for instance, you say, defendant didn't adequately test the products for benzene, blah, blah, blah. So you're saying it was Bayer's duty to independently do testing in addition to they required AeroPress to test under their contract with AeroPress? I would say yes, Your Honor, if you're selling these products to the consumer level. And you're deriving that duty from which of the CFRs that's asserted here? I would say 21, I'd say the CFR cited in paragraphs 50 through 52 of the complaint, which we read to apply to drug manufacturers in addition to suppliers. Bayer is obviously the one who's supervising AeroPress. Bayer can't just wipe its hands clean and say, you know, this is all on you, not on us. Bayer can certainly, as they have, they can sue their supplier and say, you're really the one that screwed up here. And we want indemnification for the damages that we've incurred, but it was still a responsibility that the Bayer owed to consumers. I mean, that's been tort law for the last century. So I think that the requirements apply as much to Bayer as they do to AeroPress. Okay. All right. Thank you, Your Honors. All right. We thank both counsel for excellent arguments today and very helpful briefing. We would also like to have a transcript of today's argument. In this case, split between the parties, and we will take the case under advisement.